602 S.E.2d 173 (2004)
268 Ga. App. 637
In the Interest of W.N.J., a child.
No. A04A1383.
Court of Appeals of Georgia.
July 7, 2004.
Reconsideration Denied July 21, 2004.
Certiorari Denied November 22, 2004.
*174 Walter Britt, Chandler & Britt, Buford, Drew Findling, The Findling Law Firm, Atlanta, for Appellant.
Daniel Porter, District Attorney, for Appellee.
ELDRIDGE, Judge.
A delinquency petition was filed in Gwinnett County Juvenile Court, alleging that W.N.J. had committed the offenses of failure to maintain lane (OCGA § 40-6-48); racing on highways or streets (OCGA § 40-6-186); operation of an unsafe vehicle (OCGA § 40-8-7); violation of an instructional permit (OCGA § 40-5-24); seat belt violation (OCGA § 40-8-76); driving under the influence (OCGA § 40-6-391); two counts of vehicular homicide first degree (OCGA § 40-6-393(A)); reckless driving (OCGA § 40-6-390); and speeding (OCGA § 40-6-181). Pursuant to the State's motion, the juvenile court conducted a hearing under OCGA § 15-11-30.2 to determine whether to transfer the case against W.N.J. to superior court for prosecution. The juvenile court ordered the transfer, and W.N.J. appeals therefrom.
On Friday, March 7, 2003, at approximately 4:30 p.m., 16-year-old W.N.J., accompanied by Jacob Miller, arrived in her car at the Ingles' parking lot on Peachtree Parkway in Gwinnett County. A group of teenagers had gathered in the parking lot. Almost as soon as she arrived, W.N.J. challenged 17-year-old Susan Osley to an automobile race. Osley *175 accepted and both of them left the parking lot. During the race, W.N.J., whose southbound car was traveling at speeds of approximately 90 mph, lost control of her car, crossed the center grass median, and went airborne. W.N.J.'s car hit the front of a northbound Honda Accord driven by Julia Burns, pushing it into the path of a Ford Thunderbird driven by James Watkins causing the Honda and the Ford to collide. After colliding with the Honda, W.N.J.'s car rolled over the hood of the Honda and landed on the hood of a Nissan Pathfinder driven by Neal Russell who was also traveling northbound on Peachtree Parkway behind Watkins' Ford. The cars driven by W.N.J. and Burns were so damaged they appeared to have been put through a car crusher. The cars belonging to Watkins and Russell were also totaled. Miller and Burns died as a result of the collision.
At the time of the collision, W.N.J. had been licensed for less than six months and, therefore, she was not allowed to have a nonfamily member as a passenger in her car. Further, the burgundy BMW which she was driving was unsafe to drive. The tires had little tread (one tire had no tread), and the brake pads were extremely thin. W.N.J. was aware of the safety issues regarding her car, having been informed by Miller's mother some weeks earlier that her tires were unsafe and that she needed to have her brakes checked. The parties stipulated that the Georgia State Crime Lab's chemical analysis of W.N.J.'s urine showed that W.N.J. had ingested marijuana within 72 hours prior to the March 7th incident. It was further stipulated that there was an insufficient amount for an expert to make a determination as to whether she was impaired at the time of the collision.
The evidence showed that March 7, 2003, was not the first time W.N.J. had wanted to engage in racing or had driven recklessly. Derrick Christiansen testified that during the week prior to March 7, 2003, W.N.J. approached him on multiple occasions and challenged him to race. The first two times were in the hallway and in the cafeteria of Norcross High School. When he refused, W.N.J. called him names. Later in the parking lot, as Christiansen drove by, W.N.J. signaled him, inviting him to race and, again, verbally challenged him. On a separate day, W.N.J. pulled up to Christiansen's car and verbally challenged him to race. When he refused, she followed him, tailgating his car for a time. When she finally passed him, Christiansen observed her weaving in and out of traffic. On one final occasion, W.N.J. challenged Christiansen to race while they were in the Ingles' parking lot. Again, he refused.
John Bell testified that he lived in the same subdivision where Miller's family resided. Bell testified that he saw W.N.J. driving in the neighborhood at least twice a week. Bell testified that on numerous occasions he had observed W.N.J. driving her car above the posted speed limit and that he had yelled at her on at least three occasions to slow down. Bell further testified that on many occasions he had observed W.N.J. running the stop sign that was located near his home.
The record also shows that W.N.J. began abusing drugs at age 12 and that between age 12 and 16, she moved from abuse of over-the-counter cold medication to Ecstacy and marijuana. At the time of the collision, W.N.J. was using marijuana on a daily basis. Further, the record shows that W.N.J. admitted to prior acts of shoplifting, which had brought her to the attention of juvenile authorities on two occasions. Held:
1. W.N.J. alleges that the trial court erred in allowing Jill Berman, the daughter of one of the deceased victims, to testify.
At the hearing Berman was called as a witness to testify to her personal observations of teen driving habits in the general location of the collision in order to show it was in the interests of the community for W.N.J. to be treated as an adult and to transfer her case to superior court. Specifically, Berman testified that she drove in the area where the collision occurred on an almost daily basis in order to visit with her mother and take her son to karate lessons. Berman testified that for a period of about two years prior to the collision and subsequent thereto, she had observed teenagers driving dangerously in the area of the collision. Berman further testified that she had *176 observed teenagers congregating in the Ingles' parking lot and the nearby McDonald's, where they drove "in and out quickly, not looking, skidding, [and] driving extremely fast." Berman went on to testify that she had personally observed teenagers "laying drags, squealing their tires at stop lights, [and] leaving at an excessive rate of speed." Berman testified that she had observed cars with teenage drivers driving parallel to each other at a high rate of speed. Moreover, Berman testified that she had expressed concern to her mother on several occasions about the safety of driving within that area.
Pursuant to OCGA § 15-11-30.2(a), one of the issues to be considered by the juvenile court in determining if transfer is appropriate is the interests of the community in the transfer. Berman's testimony was relevant to this issue as it went to the general teenage driving habits in the area of the collision and its impact on the community. The juvenile judge has a broad discretion in determining what is proper evidence under the "interests of the child and the community" and the trial judge did not abuse his discretion in allowing Berman's testimony.
Further, contrary to W.N.J.'s argument, Berman's testimony did not constitute improper victim-impact evidence. Victim-impact evidence goes to the impact of the crime on the victim, the victim's family, or the community. See OCGA § 17-10-1.2. Berman's testimony did not touch on these areas. Berman's testimony went only to her observations of teen driving habits in the general vicinity of the collision, testimony which any witness who was not familiar with the crime, but was familiar with the driving habits of teenagers in the area and the dangers thereof, could have given.
Moreover, even if this was not so, "there is a presumption, in the absence of a strong showing to the contrary, that the trial judge, when sitting without a jury, separates the legal evidence from facts not properly in evidence in reaching his decision." (Citation and punctuation omitted.) Raborn v. State, 192 Ga.App. 99, 100(2)(b), 383 S.E.2d 650 (1989). In the transfer order, there is no indication that the juvenile judge considered Berman's testimony in rendering his decision.
2. W.N.J. alleges that the trial court abused its discretion in transferring her case to the superior court.
[A] juvenile court may transfer an offense for prosecution in the superior court if the court determines there are reasonable grounds to believe that (1) the child committed the delinquent act; (2) the child is not mentally ill; (3) the interests of the child and the community require that the child be placed under legal restraint and the transfer be made; and (4) the child was at least 15 years of age at the time of the alleged delinquent conduct or the child was 13 or 14 years of age at the time and committed an offense for which the punishment is loss of life or confinement for life in a penal institution.
(Citations omitted.) In the Interest of B.J.W., 247 Ga.App. 437, 439, 543 S.E.2d 811 (2000). See OCGA § 15-11-30.2(a)(3) and (4).
It is undisputed that W.N.J. was 16 years old at the time of the collision and that she was not committable to an institution for the mentally retarded or mentally ill. Further, for the purpose of this appeal, W.N.J. does not contest that evidence existed to show that she committed the delinquent acts. W.N.J., however, argues that the trial court abused its discretion in making the determination that it was in the best interest of the child and the community that the case be transferred to superior court; W.N.J. argues that she is amenable to treatment in the juvenile system. She bases this argument on testimony given at the transfer hearing that after the collision she was admitted to Cottonwood Day Tuscon, an inpatient treatment facility which treats, among others, female adolescents with issues of substance abuse, mood disorders, self harm, trauma, and eating disorders. There, W.N.J. was treated for substance abuse, physical and emotional trauma from the car accident, and emotional problems resulting from past sexual abuse. Initially, W.N.J. was guarded and defensive. However, lead therapist Peter Augustus Biava testified that during the 45 days she was at the facility, W.N.J. opened up and gained *177 insight into her emotional issues. Upon leaving Cottonwood, W.N.J. entered Gables, an extended stay facility for women with drug abuse issues. Biava opined that W.N.J. would benefit from a structured therapeutic environment and that he could not give an opinion as to her continued success with sobriety if placed back into her old environment.
"[T]he function of this court is limited to ascertaining whether some evidence exists to support the juvenile court's determination." (Punctuation omitted.) In the Interest of J.B.H., 241 Ga.App. 736, 737, 527 S.E.2d 18 (2000). "Moreover, even if there is evidence that the child may be amenable to treatment, the juvenile court may still transfer the case if it finds that the amenability factor is outweighed by the interest of the community in treating this child as an adult. [Cit.]" Id. at 739(2), 527 S.E.2d 18.
Here, there was evidence that after the collision W.N.J. went into a treatment facility for a short period of time before she entered Cottonwood. During the three to five day gap between her discharge from the first facility and her admission into Cottonwood, W.N.J. abused drugs. The trial court reasoned that W.N.J.'s use of illegal drugs after two people had died in a collision that she caused showed a lack of insight and a probability of continued drug use on her behalf. The court further took into consideration the severity of the offense; W.N.J. being the instigator of the offense which resulted in the death of two people; W.N.J.'s driving with a nonfamily member in violation of the condition of her driver's license; multiple instances of W.N.J. attempting to initiate car races; W.N.J.'s history of improper driving; W.N.J. knowingly driving a car with unsafe tires and brakes; W.N.J.'s history of drug use and shoplifting, some of which predated her emotional problems arising out of her parents' divorce and past sexual abuse; and that the co-defendant in the race was being charged as an adult. Based on these findings, the juvenile court found that W.N.J. was not amenable to treatment in the juvenile court system and that the interests of the child and the community would be better served if the case was transferred to the superior court. Under these facts, we find no abuse of discretion in the juvenile court's determination. See In the Interest of K.S.K., 216 Ga.App. 257, 454 S.E.2d 165 (1995).
W.N.J. argues that the juvenile court's transfer order was factually erroneous inasmuch as there was no evidence that the co-defendant was 17 years old and being charged as an adult. Although there was no direct testimony of Osley's age at the time of the offense, the juvenile complaint clearly identifies the co-defendant as Susan Osley, age 17. This complaint was part of the juvenile court's record in this case and the juvenile judge was authorized to rely on the facts contained in the record before him in making his decision. See In the Interest of J.B., 234 Ga.App. 775, 776(1), 507 S.E.2d 874 (1998).
Judgment affirmed.
RUFFIN, P.J., and ADAMS, J., concur.