**SECOND DIVISION**
**BARNES, P. J.,**
**MCFADDEN and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**February 5, 2013**

# In the Court of Appeals of Georgia

A12A1792. IN THE INTEREST OF J. R. L., a child.

BARNES, Presiding Judge.

J. R. L., a sixteen-year-old male, was charged in the Juvenile Court of Fannin County with first-degree vehicular homicide and multiple other crimes arising out of a fatal motor vehicle collision. Following a hearing, the juvenile court entered an order transferring the case to the Superior Court of Fannin County on the ground that J. R. L. should be tried as an adult pursuant to OCGA § 15-11-30.2 (a). J. R. L. appeals from the transfer order,[1] contending that the juvenile court abused its discretion by finding that he was not amenable to treatment in the juvenile system and that the interests of the child and the community required the transfer of jurisdiction

---

[1] "An order transferring a case from juvenile to superior court is a final order that is directly appealable." *In the Interest of R. W.*, 299 Ga. App. 505, n.1 (683 SE2d 80) (2009).

to the superior court. Concluding that the juvenile court acted within its discretion in ordering the transfer of the case, we affirm.

> Before transferring jurisdiction from juvenile to superior court [pursuant to OCGA § 15-11-30.2 (a)], the juvenile court must find that there are reasonable grounds to believe that the child committed the delinquent act alleged; the child is not committable to an institution for the mentally retarded or mentally ill; the interests of the child and the community require that the child be placed under legal restraint and the transfer be made; and the child was at least 15 years of age at the time of the alleged delinquent conduct.

(Citation omitted.) *In the Interest of D. M.*, 299 Ga. App. 586 (683 SE2d 130) (2009). On appeal from a transfer order, "the function of this Court is limited to ascertaining whether there was some evidence to support the juvenile court's determination that the requirements of OCGA § 15-11-30.2 have been met, and absent an abuse of discretion, we will affirm the order transferring jurisdiction." *In the Interest of D. C.*, 303 Ga. App. 395 (1) (693 SE2d 596) (2010).

The evidence presented at the transfer hearing showed that late at night on July 1, 2011, J. R. L. was driving his pickup truck south on Highway 515 in Fannin County. There was one passenger in the truck with him. J. R. L. was driving fast and lost control of the truck, nearly hitting a concrete barrier at the entrance to a gasoline

station before the passenger took control of the wheel to prevent the collision. After nearly missing the concrete barrier, J. R. L. regained control of the steering wheel, was laughing, and began to jerk the steering wheel back and forth in an erratic manner, causing the truck to sway. J. R. L. then lost control of the truck for a second time, went off the highway, and struck a guard rail before continuing down the highway on the right shoulder of the road. As he drove down the shoulder of the road, J. R. L. ran a red light at a high rate of speed, narrowly missing a sheriff's deputy in his cruiser. As the deputy pulled out onto Highway 515 to intercept J. R. L., he saw that there was traffic stopped at a red light at the next intersection.

A Honda minivan occupied by a husband, his pregnant wife, and their four young children was stopped at the red light. J. R. L. crashed into the rear of the minivan at 75 m.p.h. in what was a 55 m.p.h. zone. As a result of the collision, the parents' six-year-old daughter was killed; their three-year-old son suffered a spinal cord injury and is now quadriplegic, hydrocephalic, and ventilator-dependent; their nine-year-old daughter broke her pelvis and several other bones; their ten-year-old daughter broke her right femur and right wrist; and the pregnant wife suffered a head laceration and broke multiple ribs.

When the sheriff's deputy arrived at the scene of the collision, he saw J. R. L.

3

on the ground next to the truck and went over to him. As J. R. L. tried to speak, he was "thick-tongued," which the deputy knew from experience was common in individuals who were intoxicated or under the influence of some substance. A criminal investigator with the Appalachian Judicial Circuit District Attorney's Office later took the statement of J. R. L.'s passenger, who admitted that he and J. R. L. had been "huffing" computer duster shortly before the collision occurred.

According to the passenger, he had met J. R. L. at a fireworks show earlier that evening, and J. R. L. had asked him if he had ever "huffed." The passenger indicated that he had not. J. R. L. showed the passenger a can of "Perfect Duster" computer duster and demonstrated to the passenger how to "huff" by inhaling the chemical vapors from the can through his mouth. When the passenger expressed concern that huffing could be harmful, J. R. L. told him not to worry because he huffed all the time.

The passenger got into J. R. L.'s truck, and J. R. L. drove them to a package store where they purchased beer from someone who J. R. L. knew would sell to underage kids. After purchasing the beer, J. R. L. drove them around as they looked for a party to attend. As they drove, the passenger said he wanted to try huffing the computer duster, and J. R. L. agreed to teach him. J. R. L. parked the truck in a strip

4

mall parking lot. Once in the parking lot, the passenger huffed from the computer duster two times while receiving instruction from J. R. L., and J. R. L. huffed three times. The passenger also drank some beer. J. R. L. then decided to continue driving to a restaurant parking lot down the road, where they would be able to drink beer and continue huffing with less risk of being seen. J. R. L. pulled out onto Highway 515 and began driving fast and erratically, and the fatal collision happened moments later.

Following the collision and the investigation revealing that J. R. L. had been huffing computer duster, the State filed a delinquency petition charging him with homicide by vehicle in the first degree for the death of the six-year-old child, multiple counts of serious injury by vehicle for the injuries sustained by the various family members, driving under the influence of an intoxicating substance to the extent that he was less safe to drive, reckless driving, failure to maintain lane, failure to perform duty on striking a fixed object, and possession of an open container of alcoholic beverage in the passenger area. The State filed a motion to transfer the case to the superior court pursuant to OCGA § 15-11-30.2 (a), and the juvenile court conducted a motion hearing.

During the hearing, in addition to the evidence discussed above, the State presented the expert testimony of a forensic toxicologist with the Georgia Bureau of

Investigation Crime Lab. The toxicologist had tested a blood sample taken from J. R. L. after the collision, and she testified that it contained difluoroethane, the chemical propellant in computer duster and an aerosol. According to the toxicologist, difluoroethane acts as a central nervous system depressant and can result in effects similar to alcohol intoxication, including an initial euphoric feeling, increased risk-taking behavior, dizziness, disorientation, loss of muscle control, slurred speech, and slowed reaction times.

A supervisor in the Department of Juvenile Justice also testified at the hearing about the options for dealing with J. R. L. in the juvenile system in that judicial circuit. He testified that if the case remained in juvenile court, the maximum sanction would be a disposition order committing J. R. L. to the custody of the Department of Juvenile Justice for two years. See OCGA § 15-11-70 (a).[2] According to the supervisor, if a commitment order was issued, the department's screening committee would examine factors such as J. R. L.'s legal history and psychological evaluation and would decide on a placement for him in a youth detention center, a residential treatment program, a foster home, or his own home. The supervisor noted that

_____

[2] A commitment order may be extended by the juvenile court for an additional two-year term under certain circumstances. See OCGA § 15-11-70 (a).

placements in a treatment program generally last only six to nine months. He further testified that because J. R. L. had never before been committed to the custody of the department and had not committed a designated felony act under OCGA § 15-11-63, there was no chance that he would be placed in a youth detention center, given the department's screening guidelines. The supervisor testified that J. R. L. would be seen "face-to-face" by someone in the department at most only three times a month if placed under home supervision for any part of his commitment, and that the drug test kits used by the department do not currently screen for inhalants like difluoroethane.

After hearing from the State's witnesses and several witnesses who testified on behalf of J. R. L., the juvenile court, following the factors outlined in OCGA § 15-11-30.2 (a) (3), entered a detailed order finding that transfer was appropriate. The court found that there were reasonable grounds to believe that J. R. L. committed the delinquent acts as alleged, that he was not committable to an institution for the mentally retarded or the mentally ill, and that he was at least 15 years of age at the time of the motor vehicle collision. None of these findings are disputed by J. R. L. on appeal.

The juvenile court then balanced the interest of J. R. L. in having the case remain in juvenile court with the interest of the community in having the case

7

prosecuted in superior court. The court first found that J. R. L. was amenable to treatment in the juvenile system, and that the State had not contested that issue. The court concluded that J. R. L.'s amenability to treatment in the juvenile system, his lack of criminal history, his good grades, and his aspiration to attend college weighed in favor of keeping the case in juvenile court.

The juvenile court, however, went on to detail four factors in the community's interest that weighed in favor of transfer to superior court. The first factor was the seriousness of J. R. L.'s offenses and the severity of the injuries he caused, including the death of one child and the permanent paralysis of another. The second factor was the fact that J. R. L. was the instigator of the misconduct: he made the decision to huff, he taught his passenger how to huff, and he was driving to a location to drink beer and continue huffing when the fatal collision occurred. The third factor was the limited options for detention and supervision available to the juvenile court in dealing with J. R. L., as outlined by the Department of Juvenile Justice supervisor who testified at the hearing. In this regard, the court concluded that an order committing J. R. L. to the department would be insufficient "to do justice for the harm [he] caused to the community," and would be inadequate because J. R. L. would not be placed in a secure youth detention center preventing him from committing this kind of offense

8

again. Finally, the fourth factor considered by the juvenile court was that the community had a strong interest in having a full public trial, as would be available in superior court, when "felonious conduct causes death and debilitation on its highways."

After discussing the four factors in the community's interest weighing in favor of transfer to superior court, the juvenile court noted that J. R. L. had presented opinion testimony from members of the community that the community's interest would not be served by transferring the case. But the court found that the opinion testimony carried little weight "because each person who testified was connected to [J. R. L.] or his family."

Upon balancing the interests of J. R. L. and the community, the juvenile court found that the community's interest in placing J. R. L. under legal restraint and transferring his case to superior court for prosecution outweighed J. R. L.'s interest in treatment as a juvenile. Accordingly, the juvenile court found that the State had met the criteria for transfer set out in OCGA § 15-11-30.2 (a) (3) and ordered that the criminal case against J. R. L. be transferred to superior court so that he could be tried as an adult. This appeal followed.

9

1. J. R. L. contends that the juvenile court "abused its discretion when it concluded that [he] was not amenable to treatment in the juvenile system." The juvenile court, however, did not reach that conclusion. Rather, the juvenile court expressly found that J. R. L. was amenable to treatment, but then went on to find that the amenability factor was outweighed by the community's interest in having J. R. L. treated as an adult.[3] Hence, J. R. L.'s contention is based upon a misreading of the transfer order and is without merit.

2. J. R. L. further contends that the juvenile court abused its discretion in finding that the community's interest in having him prosecuted in superior court outweighed his interest in having the case remain in juvenile court. We disagree.

"Determinations of a juvenile court made on an exercise of discretion, if based upon evidence, will not be controlled by this [C]ourt." (Citation and punctuation omitted.) *In the Interest of R. J.*, 191 Ga. App. 712, 715 (3) (382 SE2d 671) (1989). Moreover, even if, as in the present case, "there is evidence that the child may be amenable to treatment, the juvenile court may still transfer the case if it finds that the amenability factor is outweighed by the interest of the community in treating the child

---

[3] The State did not seek to transfer the case on the theory that J. R. L. was non-amenable to treatment in the juvenile system.

as an adult." (Citation and punctuation omitted.) *In the Interest of D. M.*, 299 Ga. App. at 591 (2). And the juvenile court can consider a "broad[] range of community interests" as part of its analysis. *In the Interest of R. J.*, 191 Ga. App. at 715 (3).

The record supports the juvenile court's determination that transfer was appropriate, even though J. R. L. was amenable to treatment in the juvenile court. In its transfer order, the juvenile court found that the amenability factor was outweighed by other factors weighing in favor of the community's interest in having the case transferred, namely, the seriousness of the offenses, the fact that J. R. L. was the instigator, the limited options for detention and supervision available to the juvenile court in dealing with J. R. L., and the community's need for a full and public trial.[4] Georgia precedent makes clear that all of these factors can be considered by a juvenile court in determining the weight given to the community's interest. See, e. g., *State v. M. M.*, 259 Ga. 637, 640 (3) (386 SE2d 35) (1989) ("heinous nature of the offenses" weighed in favor of community's interest in having case transferred); *In the Interest of D. C.*, 303 Ga. App. at 398 (1) (b) (severity of the offenses and fact that

---

[4] J. R. L.'s contends that the juvenile court relied "almost exclusively" on the severity of the offenses in weighing the community's interest. His contention lacks merit. The transfer order, on its face, demonstrates that the juvenile court considered four separate factors in weighing the community's interest, as discussed above.

juvenile was an instigator and coordinator of the crimes weighed in favor of community's interest in having case transferred); *In the Interest of S. K. K.*, 280 Ga. App. 877, 879 (2) (635 SE2d 263) (2006) (fact that "there would be insufficient time for the juvenile system to provide adequate treatment in a secure facility" weighed in favor of community's interest in having case transferred); *In the Interest of W. N. J.*, 268 Ga. App. 637, 641 (2) (602 SE2d 173) (2004) (severity of the offense and fact that juvenile was the instigator of the offense were factors weighing in favor of community's interest in having case transferred); *In the Interest of R. J.*, 191 Ga. App. at 715 (3) ("public's right to know the events and the outcome" of the case weighed in favor of community's interest in having case transferred).

Furthermore, while J. R. L. contends that the juvenile court did not adequately take into account the lay and expert witnesses who testified on his behalf against transferring the case to superior court, the juvenile court clearly did not abuse its discretion in this regard.[5] Questions regarding the credibility of the witnesses, the

_____

[5] J. R. L. also argues that the juvenile court "impermissibly took judicial notice of the feelings of the community when it opined [in the transfer order] that '[a]n incident of this nature is, in the Court's view, more personal in a rural community like Fannin County than in more metropolitan areas.'" His argument is without merit. In the very next sentence of the transfer order, the juvenile court made clear that it was not relying upon its own personal views about the feelings of the community by stating: "Admittedly, the Court cannot be certain of that view given the enormity of

12

weight of the evidence, and the resolution of conflicts in the testimony were for the juvenile court to decide, not this Court. See generally *In the Interest of K. A. F.*, 310 Ga. App. 142, 143 (712 SE2d 138) (2011) ("Because it is the juvenile court's role to resolve conflicts in the evidence, we do not weigh the evidence[.]"); *In the Interest of A. D.*, 295 Ga. App. 436, 437 (671 SE2d 909) (2009) (noting that "it is the role of the trial court, not this Court, to assess the credibility of witnesses").

For these combined reasons, we conclude that the juvenile court did not abuse its discretion in determining that the community's interest in having J. R. L. prosecuted as an adult in superior court outweighed his interest in having the case stay in juvenile court. The juvenile court's order transferring the case pursuant to OCGA § 15-11-30.2 (a), therefore, is affirmed.

*Judgment affirmed. McFadden and McMillian, JJ., concur.*

---

this incident; however, the Court is certain that the residents of this community deserve to know when felonious conduct causes death and debilitation on its highways."

13