**THIRD DIVISION
ELLINGTON, P. J.,
DILLARD and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 8, 2015**

# In the Court of Appeals of Georgia

A15A1624. IN THE INTEREST OF J. M. S.

DILLARD, Judge.

J. M. S. was charged with various criminal offenses, via three delinquency petitions, when he was 15 years old, and the Glynn County juvenile court granted the State's motion to transfer his case to the superior court. J. M. S. appeals, arguing that there was no evidence to support the juvenile court's finding that he was not amenable to treatment or rehabilitation and that the transfer order lacked sufficient detail to show that the court properly weighed his interest in remaining in juvenile court against the community's interest in having him treated as an adult.[1] For the reasons set forth *infra*, we affirm.

---

[1] *See In the Interest of R. W.*, 299 Ga. App. 505, 505 n.1 (683 SE2d 80) (2009) ("An order transferring a case from juvenile to superior court is a final order that is directly appealable.").

In relevant part, the evidence shows that, on September 27, 2014, an individual—later identified from surveillance footage as J. M. S.—burglarized a Glynn County pawn shop and stole a laptop computer. The next day, J. M. S. and an accomplice burglarized a second pawn shop and stole three laptop computers and a DVR recording device. The surveillance footage of the second burglary shows that the perpetrators were looking at the gun case, but they were unable to steal any guns. A few days later, on October 2, 2014, J. M. S. and his accomplice burglarized the second pawn shop yet again. But this time, a police officer responded to the scene while the burglary was still in progress. J. M. S. first brandished an AR-15 rifle at the officer before turning and running from him. During the foot chase that ensued, J. M. S. dropped the AR-15 and a backpack on the ground, but continued running through a residential area and then into some nearby woods. Although J. M. S. was "very aggressive" and "put up a fight," the officer was ultimately able to apprehend him by deploying a taser.

Subsequently, in addition to the AR-15, police officers recovered 15 other firearms from the backpack that J. M. S. had discarded. And in his 14 years working in law enforcement, the responding officer stated that he had never seen a situation where a 15 year old was in possession of that many firearms.

An investigating officer, who was an expert in gang activity, interviewed J. M. S., who admitted to being a member of a specific street gang. J. M. S. also showed the officer pictures of him "throwing gang signs," and in one of the photographs, he was with an individual known to be a member of the same criminal street gang. J. M. S. also provided the names of other known gang members. The officer believed that the burglaries were gang related, in part, because there had been prior reports that J. M. S. criminally trespassed on several businesses with well-known gang members. In addition, during his past investigations of street-gang activity, the officer had encountered numerous situations in which adult gang members used juveniles to commit crimes because, if caught, they would be prosecuted in juvenile court. The officer believed that J. M. S. had been instructed to steal a large number of weapons, which would have caused "chaos" in Glynn County.

Ultimately, three delinquency petitions were filed in the juvenile court against J. M. S. related to the pawn-shop burglaries. Specifically, the first petition charged J. M. S. with second-degree burglary, second-degree criminal damage to property, obstructing or hindering a law-enforcement officer, obstructing or hindering a law-enforcement officer with violence, possession of a handgun by a person under the age of 18, and eight counts of participation in criminal gang activity. The other two

3

petitions charged J. M. S. with one count each of second-degree burglary and participation in criminal gang activity. Thereafter, the State moved to transfer the case to superior court. After a probable cause hearing and a separate hearing on the State's motion, the juvenile court granted the motion and transferred the case to the superior court. This appeal by J. M. S. follows.

1. J. M. S. first argues that the juvenile court abused its discretion in transferring his case to superior court because the State failed to meet its burden of showing that he is not amenable to treatment or rehabilitation. We disagree.

We begin by noting that the function of this Court is limited to ascertaining whether there was "some evidence to support the juvenile court's determination, and absent an abuse of discretion, we will affirm the order transferring jurisdiction."[2]

Under former OCGA § 15-11-562 (a), the criteria that the juvenile court must consider in determining whether to transfer an alleged delinquent child to superior court includes, but is not limited to:

> (1) The age of such child; (2) The seriousness of the alleged offense, especially if personal injury resulted; (3) Whether the protection of the community requires transfer of jurisdiction; (4) Whether the alleged

---

[2] *In the Interest of A. W.*, 312 Ga. App. 513, 514 (718 SE2d 865) (2011) (punctuation omitted).

offense involved violence or was committed in an aggressive or premeditated manner; (5) The culpability of such child including such child's level of planning and participation in the alleged offense; (6) Whether the alleged offense is a part of a repetitive pattern of offenses which indicates that such child may be beyond rehabilitation in the juvenile justice system; (7) The record and history of such child, including experience with the juvenile justice system, other courts, supervision, commitments to juvenile institutions, and other placements; (8) The sophistication and maturity of such child as determined by consideration of his or her home and environmental situation, emotional condition, and pattern of living; (9) The program and facilities available to the juvenile court in considering disposition; and (10) Whether or not a child can benefit from the treatment or rehabilitative programs available to the juvenile court.[3]

As previously mentioned, J. M. S. argues that the juvenile court abused its discretion in transferring his case to superior court because the State failed to present sufficient evidence that he was not amenable to treatment or rehabilitation in the

---

[3] We note that the current version of OCGA § 15-11-562 did not become effective until July 1, 2015, and J. M. S.'s offenses and transfer hearing occurred in 2014. Thus, former OCGA § 15-11-562, which was effective from January 1, 2014, until May 4, 2015, applies in this case. *See* Ga. L. 2013, p. 294, § 1. Nevertheless, the only substantive difference between the two versions of the statute is that the current version includes one additional factor for the juvenile court's consideration—"[t]he impact of the alleged offense on the alleged victim, including the permanence of any physical or emotional injury sustained, health care expenses incurred, and lost earnings suffered." *See* OCGA § 15-11-562 (a) (5) (2015).

5

juvenile system. At the transfer hearing, a juvenile-court probation officer, who completed a predisposition risk assessment for J. M. S., testified that he scored an eight on the assessment and that anyone who scores higher than six is considered high risk. The officer further testified that, although J. M. S. had not been previously adjudicated as a delinquent child, he had three prior "informal adjustments" for various offenses, including simple battery, criminal trespass, curfew violation, possession of alcoholic beverages by a person below the legal age, and ungovernable behavior. As to whether the officer believed that the case should be transferred, she testified that she was "straddling the fence" because, although her personal opinion was that the case should not be transferred, her professional opinion "was the total opposite."

Further, while the officer did not know what type of services the Department of Juvenile Justice could provide to J. M. S., she indicated that the juvenile court has various therapy programs. And related to his prior "informal adjustments," J. M. S. had been placed in one of these programs, but he only attended once or twice and was ultimately considered to be non-compliant with that program. The officer testified that she was unaware of any programs that could deter J. M. S. from being a gang member, and she believed that the lack of adult supervision in his home contributed

6

to his "roaming the streets and stuff like that." When asked if she could think of any reason that J. M. S. would not be amenable to treatment, the officer responded that the charge that he stole an "excessive amount of guns" was deeply concerning. The officer further testified that she "most definitely" had concerns for the community in light of the serious nature of the charges.

Faced with the foregoing, we cannot say that there was *no evidence* to support the juvenile court's determination that it was "doubtful" J. M. S. was amenable to treatment in the juvenile system.[4] Indeed, J. M. S. had been non-compliant with a juvenile-treatment program in the past, and despite his history in the juvenile-court system, he continues to engage in criminal activity that has escalated in severity.[5] In

---

[4] *See In the Interest of K. P.*, 305 Ga. App. 670, 670-71 (700 SE2d 665) (2010) ("On appeal from a transfer order, the function of this Court is limited to ascertaining whether there was *some evidence* to support the juvenile court's determination that the [statutory] requirements . . . have been met." (punctuation omitted) (emphasis supplied)).

[5] *See In the Interest of J. B. H.*, 241 Ga. App. 736, 739-40 (2) (527 SE2d 18) (1999) (holding that there was sufficient evidence to support the juvenile court's decision to transfer the case to superior court based in part on the serious nature of the offenses and the minor's history in the juvenile system); *In the Interest of K. S. K.*, 216 Ga. App. 257, 259 (2) (454 SE2d 165) (1995) (concluding that juvenile court's determination that the child was not amenable to treatment was supported by the evidence when the child had engaged "habitual acts of delinquency" ); *see also* former OCGA § 15-11-562 (7) (2014) (providing that one factor to be considered in determining whether a transfer to superior court is warranted is the record and history

7

this respect, we have held that, "[e]ven if there is evidence that the child may be amenable to treatment, the juvenile court may still transfer the case if it finds that the amenability factor is outweighed by the interest of the community in treating the child as an adult."[6] Indeed, under former OCGA § 15-11-562, a child's amenability to treatment is only one of *ten* factors to be considered by the court in determining whether the community's interest in treating the child as an adult outweighs the child's interest in treatment in the juvenile system.[7] And here, even assuming J. M. S. was amenable to treatment, the juvenile court's determination that the community's

of such child, including experience with the juvenile-justice system).

[6] *In the Interest of D. M.*, 299 Ga. App. 586, 591 (2) (683 SE2d 130) (2009) (punctuation omitted); *accord In the Interest of D. C.*, 303 Ga. App. 395, 398 (1) (b) (693 SE2d 596) (2010); *see also State v. M. M.*, 259 Ga. 637, 640 (3) (386 SE2d 35) (1989) (holding that the State was not required to prove that the child was not amenable to treatment when the community's interest in treating the child as an adult outweighed the child's interest in remaining in the juvenile system due to the heinous nature of the charged offenses involved).

[7] *See M. M.*, 259 Ga. at 639-40 (2) (a), (c) (explaining that "a child's amenability or non-amenability to treatment is but one factor to consider in determining the child's and the community's interests," and that a court must balance the child's interest in treatment in the juvenile system, including but not limited to his amenability to treatment, against the community's interest in treating the child as an adult").

interest in transferring his case to superior court outweighed J. M. S.'s interest in remaining in the juvenile system was supported by the evidence.

Specifically, J. M. S.'s criminal conduct escalated from a history of minor offenses, such as trespass and curfew violations, to three commercial burglaries that occurred within the span of a few days.[8] And during the last of these burglaries, J. M. S. stole *sixteen firearms*, aimed an AR-15 rifle at a police officer, and engaged in aggressive behavior toward the officer until he was finally subdued by a taser.[9] There was also evidence that the last burglary "was very sophisticated and well thought out."[10] Additionally, an expert in gang activity believed that the burglaries were gang-related based in part on J. M. S.'s own admission to being a gang member

[8] *See* former OCGA § 15-11-562 (6) (2014) (providing that one factor to be considered in determining whether a transfer to superior court is warranted is whether the alleged offense is a part of a repetitive pattern of offenses which indicates that such child may be beyond rehabilitation in the juvenile-justice system).

[9] *See id.* (2), (4)-(5) (providing that factors to be considered in determining whether a transfer to superior court is warranted include the seriousness of the alleged offense, whether the alleged offense involved violence or was committed in an aggressive manner, and the culpability of such child including such child's level of planning and participation in the alleged offense ).

[10] *See id.* (4) (providing that one factor to be considered in determining whether a transfer to superior court is warranted is whether the alleged offense involved was premeditated).

and his prior association with well-known gang members. The expert also testified in detail about the serious danger that criminal street gangs pose to the community and noted that there had been an increase in gang-related criminal violations in Glynn County since 2012.[11] Further, he testified that the potential danger to the community if J. M. S. had successfully stolen such a large number of firearms was "very alarming."[12] Under these particular circumstances, we simply cannot say that the juvenile court abused its discretion in determining that the community's interest in transferring the case to the superior outweighed J. M. S.'s interest in remaining in the juvenile-court system.[13]

---

[11] *See id.* (3) (providing that one factor to be considered in determining whether a transfer to superior court is warranted is whether the protection of the community requires transfer of jurisdiction).

[12] J. M. S.'s appellate counsel asserts that we should take "judicial notice" that there are far more "egregious" crimes committed by juveniles in Georgia than burglary in the second degree and criminal gang activity and that the State presented no evidence that J. M. S. was not amenable to treatment other than insisting that J. M. S. had committed "the proverbial crimes of the century." We reject this contention, which disregards the serious risk of violence to the Glynn County community if J. M. S. had successfully disseminated *sixteen* firearms among gang members. Indeed, J. M. S. aimed an AR-15 at a police officer and aggressively attempted to elude him in such a way that could have resulted in serious bodily injury or death.

[13] *See In the Interest of M. J.*, 326 Ga. App. 574, 576 (757 SE2d 184) (2014) (holding that the juvenile court did not abuse its discretion in determining that the

10

2. J. M. S. also contends that the juvenile court's transfer order merely recites the relevant statutory factors without showing that it properly weighed the community's interest in transferring him to the superior court against his interest in potential rehabilitation in the juvenile system. This argument is belied by the record.

Contrary to J. M. S.'s contention, the juvenile court's seven-page transfer order reflects that it engaged in the appropriate balancing test in finding that a transfer was warranted in this case. Indeed, the court specifically found that, due to the egregious nature of his most recent offenses, J. M. S.'s interest in being prosecuted in the juvenile-justice system was outweighed by the community's interest in having him prosecuted in superior court. Thus, this argument is entirely without merit.

community's interest in treating the minor as an adult outweighed the minor's interest in remaining in the juvenile system when, *inter alia*, his gang-related action of committing an unprovoked assault on a stranger caused serious injury to the victim and his gang's actions "cast a net of fear and intimidation over the community which members of the community must confront every day." (punctuation omitted)); *In the Interest of D. M.*, 299 Ga. App. at 591 (holding that the record supported the juvenile court's conclusion that the community's interest in a transfer outweighed the child's interest in remaining in the juvenile court when, *inter alia*, the escalating nature of the criminal conduct authorized a finding that the child posed a serious threat to the community); *In Interest of J. B.*, 234 Ga. App. 775, 775, 777 (2) (507 SE2d 874) (1998) (holding that the juvenile court did not err in ordering the transfer when the court's finding that a 15-year-old gang member was a potential threat to other youths and the community at large was supported by evidence that he "brandished a gun on school property, threatened six youths, and stated that he would have shot them if he had had ammunition").

11

For all of the foregoing reasons, we affirm the juvenile court's order transferring J. M. S.'s case to the superior court.

*Judgment affirmed. Ellington, P. J., and McFadden, J., concur.*