**SECOND DIVISION**
**ANDREWS, P. J.**
**BRANCH and RICKMAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**March 23, 2016**

# In the Court of Appeals of Georgia

A15A1803. IN THE INTEREST OF T. S., a child.

RICKMAN, Judge.

T. S. appeals the juvenile court's order transferring his delinquency case to superior court for prosecution. He contends that the juvenile court erred in transferring the case to superior court because: (1) the legal standard the court used was either wrong, or correct but misapplied; (2) the court failed to consider the requisite statutory factors in deciding whether to transfer the case to superior court; (3) the court's decision to transfer the case was based solely on the nature of the alleged offenses; and (4) there was no evidence to support a transfer. We affirm.

> On appeal from an order transferring a case from juvenile court to superior court, the function of this Court is limited to ascertaining whether there was some evidence to support the juvenile court's

determination that the requirements of [former] OCGA § 15-11-30.2[1] have been met, and absent an abuse of discretion, we will affirm the order transferring jurisdiction.

(Citation omitted.) *In the Interest of D. C.*, 303 Ga. App. 395 (1) (693 SE2d 596) (2010).

In November 2014, a delinquency petition was filed in the Juvenile Court of Glynn County alleging that 15-year-old T. S.[2] committed acts which, if committed by an adult, would have constituted burglary, two counts of criminal trespass, three counts of theft by taking, and six counts of participation in criminal gang activity. The juvenile court conducted a bifurcated hearing to determine whether to transfer the case to superior court for prosecution. First, the court received evidence primarily as to whether there was probable cause that T. S. committed the acts. Second, the court

---

[1] Ga. L. 2013, p. 294, § 1/HB 242, significantly revised Chapter 11 of Title 15, effective January 1, 2014, for juvenile proceedings commenced on or after that date. The provisions of the new code addressing the transfer of a juvenile to superior court for criminal trial are found in OCGA §§ 15-11-561; 15-11-562. The proceedings at issue occurred in 2014 and are thus addressed under the new Juvenile Code. See *Walker v. State*, 330 Ga. App. 872, 874, n. 3 (769 SE2d 602) (2015); *In the Interest of M. J.*, 326 Ga. App. 574, n. 1 (757 SE2d 184) (2014).

[2] T. S. was born January 9, 1999.

received evidence and argument regarding factors it should consider when determining to transfer a juvenile's case to superior court.

In the first (probable cause) phase of the transfer hearing, evidence was adduced that on October 6, 2014, T. S. and two individuals – one man was an adult and the other individual was unidentified – broke into a home and stole two flat screen televisions and a gaming system. The homeowner testified that she had left home that day around 7:45 a.m., and returned just past noon to find that her home had been burglarized.

Surveillance cameras that police had set up in a wooded path in the area of the burglarized home captured T. S. and the two individuals carrying televisions through the path between the time the homeowner left home and the time she later returned home. One still photograph taken from the surveillance camera recording depicted T. S. holding what may have been a gun. The adult perpetrator confessed to law enforcement his involvement in the incident, and he identified himself and T. S. in surveillance photographs. The adult perpetrator told law enforcement that the idea to commit the burglary originated with T. S.; that T. S. had opened the kitchen window of the home to gain entry; and that once T. S. was inside, he opened a door for his co-perpetrators to enter. The adult perpetrator also told police that he was a member of

3

a particular gang, and a photograph depicted the adult making a gang hand signal and wearing a gang "flag." A law enforcement officer testified that he was familiar with T. S. and that prior to the burglary, he had frequently observed T. S. in the company of other gang members. The juvenile court found probable cause that T. S. had committed the offenses enumerated in the juvenile petition.

In the second phase of the transfer hearing, the following evidence was adduced. A court officer with the Glynn County Juvenile Court testified that in December 2010, T. S. was placed on an informal adjustment for ungovernable behavior; in August 2013, he was placed on probation for committing an act which, if committed by an adult, would have constituted misdemeanor theft by taking; in October 2013, he violated the terms of his probation by failing to report and was placed on probation for two years; and in August 2014, he tested positive for marijuana and again violated the terms of his probation and was placed on probation. After T. S. violated his probation in October 2013, a pick-up order was issued for T. S.'s apprehension in November 2013; T. S. turned himself in on that pick-up order in August 2014. Thus, for approximately nine months, T. S. had not reported to or otherwise accounted for his whereabouts with the juvenile probation office. After T. S. had turned himself in, the juvenile court reluctantly released T. S. into the custody

4

of his grandmother, who testified that T. S. stayed with her for about a week before he left her home and did not return. Thereafter, the acts underlying the subject of this appeal occurred.

A juvenile court officer testified that while on probation, T. S. failed to complete a moral recognition group therapy program because after attending two sessions he tested positive for marijuana and fled. The court officer further testified that T. S. was "kicked out [of school] due to poor attendance and tardiness," at the beginning of the school year, in August 2014. Thereafter, he was supposed to attend an alternative school, but he never did. At the time of the transfer hearing (which took place in December 2014) , T. S. was not enrolled in school. There was no indication that T. S. had an IEP or had been enrolled in any special education program. T. S. scored 11 on a predisposition risk assessment, indicating that he was at a high risk of re-offending. DFCS had previously been involved with T. S. at least twice.

The court officer opined that T. S. knew right from wrong, and that T. S.'s prospects for rehabilitation were good if he had stable housing and would "stay put, stay in place, don't run, [and] had a family member who could adequately care for him and supervise him" and give him a "push." The court officer testified that given T. S.'s current charges and his living situation at the time the underlying incident

5

occurred, the court officer did not know of any other program or service that the juvenile court could use to rehabilitate T. S. or keep him from re-offending.

T. S.'s grandmother testified that T. S. needed "discipline in his life," and daily supervision to ensure that he abided by the conditions of his probation and was "doing the right thing." She testified that she did not have full control of T. S.; that she worked the swing shift at a hospital; and that she could not adequately supervise T. S. on her own. She stated "I can't do it by myself."

T. S.'s mother, who lived in Jacksonville, Florida, testified that for the last 5 to 6 years, she had been in a custody battle for her children with T. S.'s father. But when the court asked her whether she wanted to take T. S. home with her that day, she replied, "No. Not at this time, I don't," explaining that she would take him back *if* he got "some help." T. S.'s mother testified that T. S.'s stepmother did not want him in the home and that thus, T. S.'s father put him out. T. S.'s father was not at the hearing and did not otherwise testify.

The court continued the hearing for a later date, explaining that it wanted to "hear from the Department of Juvenile Justice" about "other services that we don't offer. . . . to make an adequate decision on whether or not to transfer [T. S.] to Superior Court." At the continuation of the hearing, the Juvenile Court program

6

manager for the Department of Juvenile Justice ("DJJ") for the counties of Glynn and McIntosh testified. The program manager testified that once a child was committed to the custody of DJJ, a screening hearing was conducted to determine the "best possible placement for treatment and rehabilitation." The program manager provided the court with a list of privately owned providers that provide therapeutic group home services as well as behavioral health treatment services, for children committed to DJJ. The providers were independently owned; they were not subsidiaries of DJJ. And each provider had its own criteria for deciding whether a child was amenable to treatment at its facility and whether it would accept a child. The program manager testified that notwithstanding the fact that there were no programs specifically targeted for treating "gang involvement. . . . [i]f the gang involvement is part of a larger need, then it's possible that it can be addressed." The program manager further testified, however, that although some providers have accepted children with street gang charges, most tended not to do so. Typically, children at a high risk to re-offend "end-up going to YDC,"[3] if no contracted-treatment provider accepted them. The YDC offered mental health treatment, supervision, and substance abuse treatment.

---

[3] Youth Development Campus.

7

According to T. S.'s psychological evaluation, T. S. was dysfunctional, but "functioning intellectually in the average range." He was in the "Borderline range" regarding his general cognitive ability, and general verbal comprehension. He was in the "Low Average range" for general perceptual reasoning abilities, and general processing speed abilities. The psychological evaluation confirmed a prior diagnosis of Attention-Deficit/Hyperactivity Disorder and depression. Other diagnoses included Conduct Disorder and Cannibus Use Disorder.

1. T. S. contends that the juvenile court erred in transferring the case to superior court because the legal standard the court used was either wrong or correct but misapplied. We disagree.

In considering a motion to transfer a child to superior court, pursuant to former OCGA § 15-11-30.2 (a) (3), the juvenile court in its discretion determined, among other things, whether there were reasonable grounds to believe that "[t]he interests of the child and the community require that the child be placed under legal restraint and the transfer be made." Under the new Juvenile Code, a similar provision is found in OCGA § 15-11-561 (c) (2014), which provides that after consideration of certain relevant evidence, "the court may determine that . . . the welfare of the community requires that criminal proceedings against such child be instituted."

8

This Court has recognized that,

[i]n cases . . . in which the State does not rely on non-amenability to treatment as the basis for transfer, the transfer order does not have to reflect why the juvenile is not amenable to treatment. Instead, the order must balance the child's interest in treatment in the juvenile system, including but not limited to amenability to treatment, against the community's interest in treating the child as an adult.

(Citation and punctuation omitted.) *In the Interest of D. C.*, 303 Ga. App. at 398-399 (1) (c).

(a) *Wrong standard.* T. S. challenges the following excerpt in the "Conclusions of Law" section of the transfer order: "the interests of the child to be treated in the juvenile justice system are outweighed by the rights of the community to have this case tried in Superior court." T. S. argues that the challenged excerpt reflects that the court erroneously "weighed [against T. S.'s interests] the *rights* of the community, rather than the community's interests or welfare." But on the same page of the transfer order, just above the conclusions of law section, the court wrote:

[A]side from the said delinquency history, the court, in its discretion, determines that the egregious nature of these most recent offenses which [T. S.] is alleged to have committed, are sufficient, whether or not [T. S.] is amenable to treatment in the juvenile system, for the court, in its discretion, to find that his interest is [sic] being prosecuted for these

9

juvenile offenses in the juvenile justice system are outweighed by the *interest* of the community to have him prosecuted on these charges in the Superior Court.

(Emphasis added.). Therefore, we find no merit in T. S.'s contention that the court's later reference to "rights" instead of "interest" or welfare reflected that the court failed to apply the requisite balancing test.

(b) *Correct standard but misapplied*. T. S. argues that even assuming the court used the correct standard, it was misapplied.

T. S. appears to take issue with the court's determination that, "The public is entitled to know that some juveniles are involved in very serious criminal offenses." He argues that this "right to know" determination infringed upon his fundamental right to privacy. But by statute, the juvenile court is expressly authorized to determine, in its discretion and after considering specific factors, whether to transfer a child to superior court, See OCGA § 15-11-561. As T. S. made no challenge below to the court's statutory authority to make his case public, his claim on appeal that doing so violated his right to privacy is waived. See generally *State v. Burks*, 240 Ga. App. 425, 428 (2) (523 SE2d 648) (1999).

10

2. T. S. contends that the juvenile court erred in transferring the case to superior court because the court failed to consider and failed to make factual findings regarding the requisite statutory factors listed in OCGA § 15-11-562 in deciding whether to transfer the case to superior court. This argument is belied by the record.

Pursuant to OCGA § 15-11-562 (a) (2014), the criteria the juvenile court shall consider in determining whether to transfer an alleged delinquent child to superior court includes, but shall not be limited to:

(1) The age of such child; (2) The seriousness of the alleged offense, especially if personal injury resulted; (3) Whether the protection of the community requires transfer of jurisdiction; (4) Whether the alleged offense involved violence or was committed in an aggressive or premeditated manner; (5) The culpability of such child including such child's level of planning and participation in the alleged offense; (6) Whether the alleged offense is a part of a repetitive pattern of offenses which indicates that such child may be beyond rehabilitation in the juvenile justice system; (7) The record and history of such child, including experience with the juvenile justice system, other courts, supervision, commitments to juvenile institutions, and other placements; (8) The sophistication and maturity of such child as determined by consideration of his or her home and environmental situation, emotional condition, and pattern of living; (9) The program and facilities available to the juvenile court in considering disposition; and (10) Whether or not

11

a child can benefit from the treatment or rehabilitative programs available to the juvenile court.

At the transfer hearings, evidence was adduced as to each statutory factor, and the court heard argument as to each factor. In addition to the pertinent evidence set forth above, the law enforcement officer to whom the adult perpetrator had confessed his involvement was an expert in the area of gang investigation, and he testified that he had extensive "street hours" of dealing with gang members in Glynn County. He testified that there had been a rash of burglaries in the area near the burglary in the underlying case, and that when gangs started coming into Glynn County, the occurrence of minors carrying weapons began "getting worse and worse." This scenario, the officer testified, increased the danger to the community.

The record, as a whole, reflects that the court "engaged in the appropriate balancing test in finding that a transfer was warranted in this case." *In the Interest of J. M. S.*, 334 Ga. App. 142, 147-148 (2) (778 SE2d 391) (2015). Therefore, T. S.'s argument is without merit.

3. T. S. contends that the juvenile court erred in transferring the case to superior court because the court's decision to transfer the case was based solely on the nature of the alleged offenses. Specifically, T. S. argues that when the juvenile

court determined in its order that the egregious nature of the offenses was sufficient for the court to find that his interest in being prosecuted in the juvenile justice system was outweighed by the interest of the community to have him prosecuted in superior court, *"whether or not [T. S.] is amenable to treatment in the juvenile justice system,"* (Emphasis in original.), the court disregarded his amenability to rehabilitation in juvenile court and based its transfer decision solely on the nature of the alleged offenses. This contention lacks merit.

As addressed in Division 2, supra, the record reflects that the court engaged in the appropriate balancing test in finding that a transfer was warranted in this case. Regarding the particular error enumerated here, the record shows that the court considered whether other programs or services in the juvenile justice system might be available to help T. S. Moreover, in the sentence preceding the one challenged here, the trial court found that "[a] review of [T. S.'s] prior delinquency history with the Glynn County Juvenile Court and his behavior and compliance with his probated sentences, indicates that it is doubtful that he is amenable to treatment in the juvenile system, as he has not complied with most, if not all, of the terms of his probated sentences." Consequently, the order demonstrates the court's express consideration of T. S.'s delinquency history with the juvenile court and his behavior and

noncompliance with the terms of prior probated sentences, aside from the nature of the offenses T. S. is alleged to have committed. Therefore, there is no merit to this contention.

4. T. S. contends that the juvenile court erred in transferring his case to superior court because there was no evidence to support a transfer. Specifically, T. S. argues that "any finding that he is not amenable to rehabilitation is contrary to the evidence and without evidence to support it."

In this case, the juvenile court did not find that T. S. was not amenable to rehabilitation; instead, the court "doubted" that he was – a finding the court was authorized to make, given the evidence. See *In the Interest of J. M. S.*, 334 Ga. App. at 144-146 (1). T. S. had been non-compliant by failing to abide by conditions of his probations, and despite his history in the juvenile court system and various measures having been taken to help him, he continued to engage in criminal activity that escalated in severity. The juvenile petition alleged that T. S. committed acts which, if committed by an adult, would have constituted burglary and multiple counts of criminal trespass, theft by taking, and participation in gang activity. There was evidence that T. S. kept the company of gang members; one of the perpetrators in the underlying case was an adult gang member; and T. S. possibly carried a firearm

14

during the commission of the underlying alleged acts, which he instigated. "And here, even assuming [T. S.] was amenable to treatment, the juvenile court's determination that the community's interest in transferring his case to superior court outweighed [T. S.'s] interest in remaining in the juvenile system was supported by the evidence." Id. at 146; see *In re D. C.*, 303 Ga. App. at 397-398 (1) (b).

T. S. has presented no basis to disturb the juvenile court's ruling. Therefore, for all of the foregoing reasons, we affirm the juvenile court's order transferring T. S.'s case to superior court.

*Judgment affirmed. Andrews, P. J., and Branch, J., concur.*