**WHOLE COURT**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**January 23, 2019**

# In the Court of Appeals of Georgia

A16A2213. IN THE INTEREST OF: K. S., a child.

BARNES, Presiding Judge.

After a series of car break-ins and the theft of a vehicle, the State filed a delinquency petition in the Juvenile Court of Douglas County alleging that K. S. had committed acts that, if committed by an adult, would have constituted 32 counts of entering an automobile with intent to commit a theft, one count of theft by taking a motor vehicle, and one count of participating in criminal street gang activity. The State filed a motion seeking to have K. S.'s case transferred to superior court for prosecution, and after conducting a hearing, the juvenile court entered an order granting the State's motion. It is from that order that J. S. now appeals.

This is the second appearance of this case before this Court. In the first appeal, we dismissed the appeals of K. S. and four other juvenile defendants on the ground

that they should have followed the interlocutory appeal procedure when appealing an order transferring a case from juvenile court to superior court. *In Interest of J. H.*, 340 Ga. App. 733 (797 SE2d 185) (2017). The Supreme Court of Georgia reversed our decision, holding that K. S. could directly appeal the transfer order, and remanded the case to this Court for consideration of K. S.'s claims on the merits.[1] *In the Interest of K. S.*, 303 Ga. 542 (814 SE2d 324) (2018). Accordingly, we vacate our prior decision and adopt the Supreme Court's decision as our own, and, for the reasons discussed more fully below, we affirm the juvenile court's transfer of K. S.'s case to superior court.

At the outset, we note that OCGA §§ 15-11-561 and 15-11-562 of Georgia's Juvenile Code address the transfer of a juvenile's case to superior court for criminal prosecution.[2] See *In the Interest of T. S.*, 336 Ga. App. 352, 353, n. 1 (785 SE2d 32) (2016). OCGA § 15-11-561 (a) provides, in relevant part, that before transferring jurisdiction from juvenile to superior court, the juvenile court must determine that

---

[1] Of the five juvenile defendants, only K. S. filed a petition for a writ of certiorari with the Supreme Court.

[2] The current versions of OCGA §§ 15-11-561 and 15-11-562 became effective on July 1, 2017, after the juvenile proceedings occurred in this case. See Ga. L. 2017, p. 500, §§ 2-3, 2-4; OCGA § 1-3-4 (a) (1). However, the 2017 amendments did not alter the statutory language pertinent to this appeal.

> (1) There is probable cause to believe that a child committed the alleged offense; (2) Such child is not committable to an institution for the developmentally disabled or mentally ill; and (3) The petition alleges that such child (A) Was at least 15 years of age at the time of the commission of the offense and committed an act which would be a felony if committed by an adult . . . .

After making those determinations, and "after consideration of a probation report, risk assessment, and any other evidence the court deems relevant, including any evidence offered by a child," the juvenile court "may determine that because of the seriousness of the offense or such child's prior record, the welfare of the community requires that criminal proceedings against such child be instituted" and transfer the case to superior court. OCGA § 15-11-561 (c). In considering whether transfer is appropriate, the juvenile court also must consider the non-exhaustive list of eleven criteria set forth in OCGA § 15-11-562 (a). See OCGA § 15-11-561 (c); *In the Interest of T. S.*, 336 Ga. App. at 357-358 (2). If the juvenile court determines that transfer is appropriate and the juvenile appeals that decision, "the function of this Court is limited to ascertaining whether there was some evidence to support the juvenile court's determination . . . , and absent an abuse of discretion, we will affirm the order transferring jurisdiction." (Citation and punctuation omitted.) *In the Interest of T. S.*,

3

336 Ga. App. at 352-353. Guided by this framework, we turn to the arguments raised by K. S. on appeal.

1. K. S. contends that the juvenile court erred in finding that there was probable cause to believe that he committed the alleged offenses under OCGA § 15-11-561 (a) (1). Probable cause exists if the totality of the facts and circumstances would warrant a reasonable person to believe that the juvenile committed the alleged offense. See *Hughes v. State*, 296 Ga. 744, 748-749 (2) (770 SE2d 636) (2015). "A probable cause inquiry . . . is a flexible and practical assessment of probabilities given a particular factual context." (Citations and punctuation omitted.) *Caffee v. State*, 303 Ga. 557, 561 (2) (814 SE2d 386) (2018). In a transfer hearing, hearsay evidence is admissible to establish probable cause. See *In the Interest of D. C.*, 303 Ga. App. 395, 400 (3) (693 SE2d 596) (2010).

At the transfer hearing, a juvenile investigator with the Douglas County Sheriff's Office who had reviewed the police investigatory reports pertaining to the 32 car break-ins and the stolen vehicle testified to events as follows. In the early morning hours of July 17, 2015, deputies from the Douglas County Sheriff's Office responded to multiple complaints of car break-ins along several streets of a subdivision in Douglas County, Georgia. In total, the perpetrators had broken into 32

4

cars, and personal property was taken from several of the vehicles. A Toyota Camry also had been stolen. One victim reported to a deputy that he saw four to five males jumping out of a car and running towards residential yards and vehicles around 4:30 a.m. According to the victim, he saw one of the males carrying a small air compressor, and another victim confirmed that an air compressor had been stolen from his car.

Later on July 17, an officer with the City of Atlanta Police Department ("APD") observed a Hyundai, which had been reported stolen in a carjacking, traveling down the road, followed closely by the stolen Toyota. The APD officer recognized the occupants of the two cars as being members of a local gang that had a history of breaking into cars but had escalated to stealing cars and carjackings. When the APD officer turned around his patrol car and began following the Hyundai and Toyota, both cars accelerated at a high rate of speed and failed to stop when the officer activated his lights and siren. A high-speed police chase ensued, and a video of the chase recorded on the APD officer's dash camera was admitted into evidence at the transfer hearing.

As the chase progressed, the Toyota followed closely behind the Hyundai until the two cars separated when the Hyundai struck another vehicle and veered off in a

5

different direction. The Hyundai continued to flee from the pursuing officers, speeding through traffic down surface roads and several interstates before crashing. The four males inside the Hyundai, all of whom were juveniles, fled from the car on foot but were apprehended by the police.

During the subsequent search of the Hyundai, the police recovered items that had been stolen from several of the cars that had been broken into in Douglas County. The police also recovered from inside the Hyundai a laptop belonging to the owner of the stolen Toyota. One of the juveniles in the Hyundai had a handgun in his possession and keys belonging to two additional vehicles that had been reported stolen in carjackings. Fingerprint evidence linked one of the juveniles to a vehicle involved in a carjacking and linked another one of the juveniles to the scene where the car break-ins had occurred in Douglas County.

Meanwhile, after separating from the Hyundai, the stolen Toyota continued to flee from the police. The pursuing officers chased the Toyota to an apartment complex, where the three male occupants – an adult and two juveniles – jumped from the still-moving car. Officers apprehended them after a brief foot chase. K. S., who was then 16 years old, was one of the apprehended juveniles.

After all of the occupants of the Hyundai and Toyota were apprehended, one of them told the police that he believed that K. S. and several of the other juveniles had been involved in the car break-ins in Douglas County. Moreover, one of the occupants admitted that they had all been together earlier that day before the chase had occurred, and a restaurant receipt corroborated his statement. Another one of the occupants explained to the police how a high number of cars could be broken into quickly using a screwdriver and a small rock or brick, and the police found such a rock inside the Toyota.

The police recovered a cell phone from the Hyundai that had been stolen from one of the Douglas County cars, and a review of its contents by the police revealed that K. S. had begun to reprogram the phone for his own use. Additionally, when K. S. was taken into custody, the police recovered his personal cell phone and obtained a search warrant for it. Photographs, video recordings, and text messages from that phone showed K. S. making gang signs, referencing various gang affiliations, and associating with the other juveniles who had been apprehended. The Facebook pages of K. S. and some of the other apprehended juveniles similarly showed them making gang signs, wearing gang colors, and associating with one another. A compact disc of the photographs and videos recovered from K. S.'s cell phone, and the pictures

from the Facebook pages of K. S. and the other juveniles were admitted into evidence at the transfer hearing.

A sergeant in the Criminal Investigations Division of the Douglas County Sheriff's Office with experience in drug and gang investigations also testified at the transfer hearing. He explained that hybrid gangs are less structured than national gangs, often include members with different gang affiliations, and adopt their own rules and symbols. According to the sergeant, K. S. and the other four juvenile defendants charged in this case were members of a hybrid gang whose modus operandi was breaking into cars and/or stealing them. The sergeant testified that the juvenile defendants used different names to refer to their gang over time, including "Billy Bad Ass," a subset of the Bloods, and "Rollin 60s," a subset of the Crips. The sergeant's opinions were based on the juvenile defendants' Facebook pages, text messages, and cell phone videos and pictures showing the defendants associating with one another, making gang signs, referencing their gang affiliations, and wearing gang colors. The sergeant also relied on information provided to him by the APD officer who initiated the car chase and who, based on his experience, knew K. S. and the other juvenile defendants by name and identified them as being members of a

gang known for carrying out car break-ins over the past few years that had escalated to car thefts and carjackings.

(a) K. S. argues that there was insufficient evidence to establish probable cause to believe that he committed 32 counts of entering an automobile with intent to commit a theft (OCGA § 16-8-18) and one count of theft by taking a motor vehicle (OCGA § 16-8-2) because there was no evidence he was involved in the car break-ins or the theft of the Toyota. We are unpersuaded.

Based on the testimony of the juvenile investigator and the police sergeant and the exhibits discussed above, there was evidence before the juvenile court that 32 car break-ins and the theft of the Toyota had occurred over the course of a single night in a subdivision; that K. S. was later apprehended after fleeing on foot from the stolen Toyota after a high-speed police chase; that the Toyota had been closely following another stolen vehicle that contained multiple items stolen from the cars that had been broken into; that a cell phone from one of the cars that had been broken into was recovered and K. S. had already begun to reprogram it; that one of the juveniles told investigators that he believed K. S. was involved in the break-ins; and that K. S. and the other juveniles were members of a gang whose modus operandi was committing car break-ins and stealing cars.

9

Given this combined evidence, the juvenile court was authorized to find that the totality of the facts and circumstances would lead a reasonable person to conclude that K. S. was a party to the offenses of entering the automobiles with intent to commit a theft and theft by taking of the Toyota. See *Dublin v. State*, 302 Ga. 60, 65 (3) (805 SE2d 27) (2017) ("Whether a person was a party to a crime can be inferred from his presence, companionship, and conduct before and after the crime was committed.") (citation and punctuation omitted); *In the Interest of J. B. H.*, 241 Ga. App. 736, 737 (1) (527 SE2d 18) (1999) ("Everyone concerned in the commission of a crime is a party to that crime and may be charged and convicted. A person is 'concerned' in the commission of a crime if he intentionally aids or abets in the commission of the crime . . . ."). See also *Drake v. State*, 274 Ga. App. 882, 883 (1) (619 SE2d 380) (2005) (recent unexplained possession of items stolen from vehicle supports inference that defendant entered vehicle with intent to commit theft); *Chandler v. State*, 138 Ga. App. 128, 129-130 (3) (225 SE2d 726) (1976) (upholding conviction of larceny by vehicle, where, among other things, defendant was passenger in stolen vehicle who was captured after flight from police).

(b) K. S. also argues that there was insufficient evidence to establish probable cause to believe that he committed one count of participating in criminal street gang

10

activity in violation of Georgia's Street Gang Terrorism and Prevention Act (the "Street Gang Act"), OCGA § 16-15-1 et seq. According to K. S., there was no evidence that he was involved with a criminal street gang and committed a predicate act of theft by taking intended to further the interests of the gang. Again, we are unpersuaded.

The Street Gang Act makes it "unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal gang activity through the commission of" certain enumerated predicate acts, including racketeering activity such as theft by taking. OCGA § 16-15-4 (a). See OCGA §§ 16-8-2; 16-14-3 (5) (xii); 16-15-3 (1) (A). Thus, to establish a violation of the Street Gang Act based on participation in criminal street gang activity, the State must prove that the defendant was employed by or associated with a criminal street gang, that the defendant committed a predicate act of criminal street gang activity, and that the commission of the predicate act was intended to further the interests of the gang. *Jones v. State*, 292 Ga. 656, 659 (1) (b) (740 SE2d 590) (2013); *Rodriguez v. State*, 284 Ga. 803, 806-807 (1) (671 SE2d 497) (2009).

As to K. S.'s association with a "criminal street gang," that term means

11

a group of three or more persons associated in fact which engages in criminal street gang activity. The existence of such a gang may be established by evidence of symbols, tattoos, graffiti, attire or other distinguishing characteristics that include, but are not limited to common activities, customs, or behaviors.

(Punctuation and footnotes omitted.) *Morris v. State*, 340 Ga. App. 295, 297 (1) (797 SE2d 207) (2017).[3] Here, as noted above, the Douglas County police sergeant testified, based on Facebook posts and cell phone videos, pictures and texts, as well as information received from the APD officer, that K. S. and the other four juvenile defendants were members of a hybrid gang that went by various names over time, including the Rollin 60s, a subset of the Crips, and whose modus operandi was

---

[3] See OCGA 16-15-3 (2) (defining "criminal street gang" as "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity as defined in paragraph (1) of this Code section. The existence of such organization, association, or group of individuals associated in fact may be established by evidence of a common name or common identifying signs, symbols, tattoos, graffiti, or attire or other distinguishing characteristics, including, but not limited to, common activities, customs, or behaviors. Such term shall not include three or more persons, associated in fact, whether formal or informal, who are not engaged in criminal gang activity."). See also OCGA § 16-15-3 (1) (J) (defining "criminal street gang activity" as "[a]ny criminal offense in the State of Georgia, any other state, or the United States that involves violence, possession of a weapon, or use of a weapon, whether designated as a felony or not, and regardless of the maximum sentence that could be imposed or actually was imposed.").

breaking into and stealing cars for the benefit of the group. The sergeant also pointed to and explained hand symbols, references to gang affiliation, and colors worn by K. S. and the juvenile defendants reflected in Facebook posts, videos, and pictures that served as distinguishing gang characteristics. Consequently, the State presented evidence that K. S. was associated with a criminal street gang as defined by law. See *Hayes v. State*, 298 Ga. 339, 341-342 (a) (781 SE2d 777) (2016); *Morris*, 340 Ga. App. at 299 (1). Compare *Jones*, 292 Ga. at 659 (1) (b) (State failed to prove that defendant was associated with a criminal street gang, where there was no testimony that defendant was a member of a gang, that his accomplices were gang members, or that the defendant and his accomplices ever displayed gang symbols or colors).

As to the predicate act of theft by taking, there was evidence that K. S. committed such an offense based on the Douglas County car break-ins, as discussed supra in Division 1 (a). And, given the evidence of the modus operandi of the gang and of K. S.'s participation in the break-ins with the other juvenile defendants, there was evidence that the commission of the break-ins was intended by K. S. to further the interests of the gang. See *Hayes v. State*, 298 Ga. at 342-343 (a); *Morris*, 340 Ga. App. at 299-301 (1).

Based on this combined evidence, the juvenile court was authorized to find that the totality of the facts and circumstances would lead a reasonable person to conclude that K. S. committed one count of participating in criminal street gang activity in violation of the Street Gang Act. See *Hayes v. State*, 298 Ga. at 341-343 (a); *Morris*, 340 Ga. App. at 299-301 (1).

2. K. S. contends that the juvenile court erred in finding that he was not committable to an institution for the developmentally disabled or mentally ill under OCGA § 15-11-561 (a) (2). We disagree.

Before the transfer hearing, the juvenile court ordered a psychological evaluation of K. S. to address whether he was amenable to treatment, whether he was developmentally disabled or mentally ill, and whether he required commitment to an institution for the developmentally disabled or mentally ill. The psychological evaluation subsequently was conducted by Dr. Shelly Prisco, a psychologist employed by the Georgia Department of Behavioral Health and Developmental Disabilities with 20 years of experience who specialized in forensic psychology and child and adolescent evaluations. After interviewing K. S. and his mother, reviewing juvenile court records, and testing K. S. using the Wechsler Abbreviated Scale of Intelligence, Second Edition, and other diagnostic tools, Dr. Prisco prepared a report

14

that she submitted to the juvenile court, and she also testified at the transfer hearing. According to Dr. Prisco's evaluation, K. S.'s scores for intellectual functioning placed him "at the upper end of the Borderline range," but his score was "likely an underestimate of his true intellectual potential" because he appeared to have rushed through the test and lacked a consistent education over the years. Dr. Prisco opined in her evaluation that K. S.'s "true intellectual ability" was more likely in the "Low Average to Average Range," and she concluded from her testing that K. S. had the ability to understand the nature and object of the proceedings against him, to comprehend his situation in relation to the proceedings, and to render assistance to his defense counsel in preparation of his case. She further concluded that based on his intellectual functioning, K. S. did not meet the criteria for an intellectual disability or mental illness requiring involuntary commitment for mental health treatment.

Dr. Prisco's psychological evaluation of K. S. provided evidence to support the juvenile court's finding that K. S. was not committable to an institution for the developmentally disabled or mentally ill. See *In the Interest of A. W.*, 312 Ga. App. 513, 515 (718 SE2d 865) (2011); *In the Interest of D. W. B.*, 259 Ga. App. 662, 662 (1) (577 SE2d 819) (2003). While K. S. questions the testing performed by Dr. Prisco and the thoroughness of her evaluation, the credibility and weight to afford her

15

testimony and psychological report were for the juvenile court to decide. *In the Interest of J. R. L.*, 319 Ga. App. 666, 672 (2) (738 SE2d 144) (2013).

3. In several related enumerations of error, K. S. maintains that the juvenile court erred in its consideration of the statutory criteria found in OCGA § 15-11-562 (a) in reaching its determination that the case should be transferred to superior court. We do not agree.

As previously noted, in determining whether transfer of a case from juvenile to superior court is appropriate, the juvenile court must consider the non-exhaustive list of criteria set out in OCGA § 15-11-562 (a). See OCGA § 15-11-561 (c); *In the Interest of T. S.*, 336 Ga. App. at 357-358 (2). Those eleven criteria are:

> (1) The age of such child; (2) The seriousness of the alleged offense, especially if personal injury resulted; (3) Whether the protection of the community requires transfer of jurisdiction; (4) Whether the alleged offense involved violence or was committed in an aggressive or premeditated manner; (5) The impact of the alleged offense on the alleged victim, including the permanence of any physical or emotional injury sustained, health care expenses incurred, and lost earnings suffered; (6) The culpability of such child including such child's level of planning and participation in the alleged offense; (7) Whether the alleged offense is a part of a repetitive pattern of offenses which indicates that such child may be beyond rehabilitation in the juvenile justice system; (8) The record and history of such child, including

16

experience with the juvenile justice system, other courts, supervision, commitments to juvenile institutions, and other placements; (9) The sophistication and maturity of such child as determined by consideration of his or her home and environmental situation, emotional condition, and pattern of living; (10) The program and facilities available to the juvenile court in considering disposition; and (11) Whether or not a child can benefit from the treatment or rehabilitative programs available to the juvenile court.

OCGA § 15-11-562 (a).

Here, the juvenile court stated in its transfer order that it had considered all of the statutory criteria in determining that transfer of K. S.'s case was appropriate. Among other things, the juvenile court indicated in its transfer order that part of the basis for its decision was K. S.'s psychological evaluation, which, as noted above, was performed by Dr. Prisco. As part of her psychological evaluation of K. S., Dr. Prisco noted that during his interview, K. S. admitted to a history of stealing cars, stealing from stores, and vandalizing property. K. S. also admitted to smoking marijuana daily from the age of 15 until his arrest. He denied being in a gang but admitted to having a history of associating with gang members and admitted to previously having to attend an alternative school because of "gang-like activity." Dr. Prisco also noted that while K. S. had no prior adjudications in the juvenile court

17

system, he currently had armed robbery and firearm possession charges pending against him in the Superior Court of Fulton County. Although his mother had attempted to get counseling for K. S. in the past, K. S. further admitted to previously not attending counseling sessions because he "did not feel he needed the counseling and did not want it." Dr. Prisco diagnosed K. S. with Conduct Disorder and Cannabis Use Disorder, and she gave a provisional diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD"). Dr. Prisco further noted in her evaluation that K. S. had scored in the low range on the Treatment Amenability Scale of the Risk-Sophistication-Treatment Inventory ("RSTI"), and that while he might benefit from treatment for his ADHD symptoms, he had "not made treatment a priority in the past when it was available to him" and suffered from Conduct Disorder, "which is difficult to treat."

In addition to relying on K. S.'s psychological evaluation, the juvenile court concluded in its transfer order that the charges against K. S. and the high speed car chase were "extremely serious and could have potentially resulted in serious physical harm or death to another or to this child"; that K. S. was currently 17 years old, which limited the length of time for treatment in a juvenile residential placement; and that K. S. already had adult charges pending against him in a different jurisdiction. The juvenile court further found that there was an inference from the evidence that the

18

commission of the multiple crimes by the gang was premeditated. The juvenile court concluded that "[t]hese factors greatly outweigh the fact that no physical injuries were suffered and no real evidence of the child's level of planning these specific crimes, and no prior history or involvement with the juvenile justice system prior to the case at bar." The court also determined that "the public is entitled to know that some juveniles are involved in very serious criminal activity," and that "[c]ases such as this one should be given the benefit of grand jury review, and if indicted, a full, fair, open trial in the Superior Court free from the confidentiality restraints imposed upon the juvenile court system." The juvenile court went on to conclude that any interest K. S. had in treatment in the juvenile court system was outweighed by the community's interest in having his case tried in superior court.

"The record, as a whole, reflects that the court engaged in the appropriate balancing test in finding that a transfer was warranted in this case." (Citation and punctuation omitted.) *In the Interest of T. S.*, 336 Ga. App. at 358 (2). In determining that transfer was appropriate, the juvenile court properly considered whether K. S. was amenable to treatment in the juvenile court system and was entitled to rely on Dr. Prisco's evaluation, which noted K. S.'s low range score on the RSTI Treatment Amenability Scale, his resistance to prior counseling efforts, and his diagnosis of

19

Conduct Disorder. See, e.g., *In the Interest of J. L. B.*, 240 Ga. App. 655, 657 (2) (523 SE2d 645) (1999) (although juvenile had no prior involvement with juvenile court system, juvenile court was authorized to find that juvenile was not amendable to treatment based on, among other things, diagnosis of Oppositional Defiant Disorder and fact that juvenile had not complied with prior mental health treatment by refusing to take medication).

Furthermore,

even if there is evidence that the child may be amenable to treatment, the juvenile court may still transfer the case if it finds that the amenability factor is outweighed by the interest of the community in treating the child as an adult. Indeed, under . . . OCGA § 15-11-562, a child's amenability to treatment is only one of [eleven] factors to be considered by the court in determining whether the community's interest in treating the child as an adult outweighs the child's interest in treatment in the juvenile system.

(Footnotes and emphasis omitted.) *In the Interest of J. M. S.*, 334 Ga. App. 142, 145-146 (1) (778 SE2d 391) (2015).

Here, even if K. S. was amenable to treatment in the juvenile court system, the juvenile relied on other relevant factors to conclude that the interest of the community outweighed K. S.'s interest in remaining in the juvenile court system. See, e. g., *In the*

20

*Interest of J. M. S.*, 334 Ga. App. at 146-147 (1) (juvenile's involvement in serious gang-affiliated crimes weighed in favor of transfer); *In the Interest of M. J.*, 326 Ga. App. 574, 576-577 (757 SE2d 184) (2014) (fact that juvenile committed serious offenses as part of a gang weighed in favor of transfer); *In the Interest of S. K. K.*, 280 Ga. App. 877, 879 (2) (635 SE2d 263) (2006) (fact that "there would be insufficient time for the juvenile system to provide adequate treatment in a secure facility" in light of the juvenile defendants' ages weighed in favor of transfer); *In the Interest of J. T.*, 214 Ga. App. 349, 350 (2) (447 SE2d 702) (1994) (fact that juvenile court had serious felony charges pending against him in superior court weighed in favor of transfer); *In the Interest of R. J.*, 191 Ga. App. 712, 715 (3) (382 SE2d 671) (1989) (juvenile court's finding that the "public's right to know the events and the outcome" weighed in favor of transfer). And, while K. S. challenges the findings made by the juvenile court and contends that the court ignored evidence in his favor in weighing the statutory factors, "[t]he function of this [C]ourt is limited to ascertaining whether some evidence exists to support the juvenile court's determination. Determinations of a juvenile court made on an exercise of discretion, if based upon evidence, will not be controlled by this [C]ourt." (Citation and punctuation omitted.) *In the Interest of*

21

*R. J.*, 191 Ga. App. at 715 (3). Accordingly, K. S. has failed to demonstrate a basis for reversal.

4. K. S. contends that the juvenile court erred in denying his motions for an independent psychiatric evaluation and for funds to hire his own expert clinical psychologist. We disagree.

OCGA § 15-11-477 (a) provides that in a juvenile delinquency case,

[a]t any time prior to the issuance of a final dispositional order, the court may order a behavioral health evaluation of a child alleged to be or adjudicated as a delinquent child which may be conducted by [the Georgia Department of Behavioral Health and Developmental Disabilities] or a private psychologist or psychiatrist.

A "behavioral health evaluation" is defined as

a court ordered evaluation completed by a licensed psychologist or psychiatrist of a child alleged to have committed or adjudicated of a delinquent act so as to provide the juvenile court with information and recommendations relevant to the behavioral health status and mental health treatment needs of such child.

OCGA § 15-11-471 (2). Additionally, OCGA § 15-11-562 (c) provides that the juvenile court "may order a transfer evaluation of a child's clinical status as it may

impact the criteria" set forth in OCGA § 15-11-562 (a) for determining whether a juvenile's delinquency case should be transferred to superior court.

Consistent with these statutory provisions, the juvenile court ordered a psychological evaluation of K. S., which, as previously noted, was performed by Dr. Prisco. Dr. Prisco had many years of experience specializing in child and adolescent evaluations, and K. S. has failed to show that she lacked the requisite expert credentials, that she was biased against him, or that her evaluation was inadequate for purposes of addressing matters relevant to the transfer hearing. Pretermitting whether there are circumstances where a juvenile would be entitled to a second mental health evaluation performed by a new expert at the State's expense in the context of a transfer hearing, we conclude that K. S. has failed to demonstrate a need for such an evaluation and expert in this case. Cf. *LaCount v. State*, 265 Ga. App. 352, 355 (2) (593 SE2d 885) (2004) (upholding trial court's denial of request for funding for a second mental health evaluation, where the defendant "did receive at the [S]tate's expense a mental evaluation, which addressed his claim of previous and ongoing mental deficiency and resulted in a finding that he could distinguish between right and wrong at the time of the offense and that he was then competent to stand trial," and where the defendant failed to show that "the evaluation he received was not by

23

a competent mental health expert") (punctuation omitted); *Callaway v. State*, 208 Ga. App. 508, 510 (1) (431 SE2d 143) (1993) (trial court did not abuse its discretion in denying motion for funds for second mental health evaluation, where the defendant failed to show a specific need for a second evaluation, and his "claim of mental deficiency was addressed in the original evaluation, which resulted in a finding of competency and the absence of any serious mental disorder"); *Jones v. State*, 189 Ga. App. 232, 237 (2) (375 SE2d 648) (1988) (defendant not entitled to "funds for alternate expert assessment and assistance," where defendant failed to show that the psychological evaluation he already received was inadequate or that the psychologist was biased against him). Accordingly, K. S. cannot succeed on this claim of error.

5. Lastly, K. S. argues that the juvenile court erred by "allowing" the State to violate the rule of sequestration. We are unpersuaded.

The record reflects that during the transfer hearing, when the juvenile investigator was providing testimony aimed at showing probable cause for the offenses charged against K. S., the State realized that there were three probation officers in the courtroom who were potential witnesses, at which point the State notified the juvenile court of the violation of the rule of sequestration that had

previously been invoked. The probation officers then were excused from the courtroom.

K. S. has failed to show any error by the juvenile court. The probation officers were promptly excused from the courtroom once it was discovered that they had remained in court in violation of the rule of sequestration. And, while K. S. fails to provide any citations to the record reflecting that the three unnamed probation officers did in fact testify later during the transfer hearing, the juvenile court would not have erred in permitting them to testify because "[w]hen the rule of sequestration is violated, the violation goes to the credibility rather than the admissibility of the witness' testimony." (Citations and punctuation omitted.) *Szorcsik v. State*, 303 Ga. 737, 741 (3) (814 SE2d 708) (2018). Moreover, violations of the rule of sequestration provide no basis for reversal in the absence of a showing of harm resulting from the violation, see *Hood v. State*, 266 Ga. 662, 663 (2) (470 SE2d 235) (1996), and K. S. has not explained how overhearing the investigator's testimony regarding the issue of probable cause would have affected the probation officers' testimony in any respect. Consequently, K. S. has failed to show any reversible error by the juvenile court.

*Judgment affirmed. Dillard, C. J., Miller, P. J., Doyle, P. J., McFadden, P. J., McMillian, Rickman, Mercier, Reese, Brown, Gobeil, Goss, Coomer, Markle, and Hodges, J.J., concur.*